# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE<br><br>JAY P. CLARK,<br><br>          Debtor.<br>_____<br><br>JEREMY GUGINO, solely in his capacity as Chapter 7 Trustee of the bankruptcy estate of the above-named Debtor,<br><br>          Plaintiff,<br><br>v.<br><br>CLARK'S CRYSTAL SPRINGS RANCH, LLC, an Idaho limited liability company; CLARK FARMS FAMILY TRUST, a trust organized under the laws of the State of Idaho; DOES 1-10; and DOES 11-20,<br><br>          Defendant.<br>_____ | Case No. 12-00649-TLM<br><br>Chapter 7<br><br><br><br><br><br><br><br><br><br><br><br>Adv. No. 13-06016-TLM |

## MEMORANDUM OF DECISION
_____

Chapter 7 trustee Jeremy Gugino ("Plaintiff") brought this action against

defendants Clark's Crystal Springs Ranch, LLC (the "LLC") and Clark Farms

Family Trust (the "Trust"). Trial was held, and the matter was later taken under

MEMORANDUM OF DECISION - 1

advisement on September 12, 2014, when the parties filed their closing briefs.

This Decision constitutes the Court's findings of fact and conclusions of law.  Fed.

R. Bankr. P. 7052.[1]

**FACTS**

> **A.    Procedural context**

Jay P. Clark ("Debtor") filed a voluntary petition commencing a chapter 12

case on March 27, 2012.  On May 31, 2013, this Court[2] converted the case to a

chapter 7 liquidation under § 1208(d) which allows for such conversion only

"upon a showing that the debtor has committed fraud in connection with the

case."[3]

---

[1]    The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). As reflected by the Pretrial Order, Doc. No. 48 at 1–2, and by subsequent stipulation, Doc. No. 49, the parties have each expressly consented to this Court entering a final decision and judgment, subject only to appellate review under 28 U.S.C. § 158, on all matters at issue in this action, including those that are or may be argued to be either "non-core" or statutorily core but outside this Court's authority as addressed in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).  *See Exec. Benefits Ins. Agency v. Arkison (In the Matter of Bellingham Ins. Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012) ("*Bellingham*") (recognizing ability of parties to so consent), *aff'd on other grounds*, *Exec. Benefits Ins. Agency v. Arkison,__* U.S. __, 134 S.Ct. 2165 (2014) ("*Arkison*").  *See also Mastro v. Rigby*, 764 F.3d 1090, 1094–95 (9th Cir. 2014) (holding that *Bellingham* remains good law after *Arkison* and parties in this Circuit may therefore consent to the entry of final judgment).

[2]    The Hon. Jim D. Pappas was the initially assigned judge on this case, and he presided over the chapter 12 case and entered the § 1208(d) ruling and order of conversion.  He thereafter entered an order of recusal and the case was reassigned.

[3]    The decision to convert, *see* Case No. 12-00649-TLM at Doc. Nos. 261 (order) and 329 (transcript of May 31, 2013 oral ruling), was affirmed by the District Court, *see In re Clark*, 2014 WL 835824 (D. Idaho Mar. 4, 2014), and Debtor has appealed to the Ninth Circuit.  The underlying fraudulent conduct of Debtor supporting conversion is discussed not only in the § 1208(d) ruling but also in related § 523(a)(2) litigation.  *See DeVries v. Clark (In re Clark)*, 2014 WL 174935 (Bankr. D. Idaho Jan. 10, 2014), and 2013 WL 6633527 (Bankr. D. Idaho Dec. 17, 2013).  The facts decided by the Court in the main case or in other adversary proceedings

(continued...)

MEMORANDUM OF DECISION - 2

Plaintiff's complaint was filed on June 7, 2013.  As chapter 7 trustee, he asserts several causes of action, all designed to recover and bring into the estate the assets of the LLC, generally consisting of $20,000 in funds, a crop insurance check of $354,000, and equipment with unknown present value but a once-asserted auction value of $364,600.  To do so, Plaintiff asserts related and, at times, alternative theories and prays for: (1) a declaratory judgment that the LLC and the Trust are "invalid entities" created as "part of a scheme to hinder, defraud or delay creditors," and that Plaintiff therefore may ignore the separate existence of these entities; (2) a judgment finding that the LLC and the Trust are the "alter egos" of Debtor and that Plaintiff therefore may "disregard the corporate existence" of the LLC and the separateness of the Trust and treat their assets as those of Debtor and this estate; (3) a declaratory judgment that the Trust is a "revocable trust" and that Plaintiff has the authority to revoke the Trust at any time; and (4) a judgment for the "substantive consolidation" of the assets and liabilities of Debtor, the LLC and the Trust.

---

[3](...continued)
constitute the "law of the case." *See, e.g.*, *Clark*, 2014 WL 174935 at *3 (citing *FDIC v. Kipperman (In re Commercial Money Ctr., Inc.)*, 392 B.R. 814, 832 (9th Cir. BAP 2008) (other citations omitted)).  The Court thus incorporates the prior findings and determinations in this Decision by reference and without further repetition.  Further, the Court takes judicial notice of its files and records, Fed. R. Evid. 201, where copies of such records were not also introduced as exhibits.  In doing so, the Court notes that such documents in the bankruptcy case file that were filed by Debtor have evidentiary import under Fed. R. Evid. 801(d)(2).  *See, e.g.*, *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n.32 (Bankr. D. Idaho 2008).

MEMORANDUM OF DECISION - 3

### B.    The Trust

Debtor, at one time a lawyer, created the Trust on February 1, 2008.[4]  Ex. 100.  Debtor was both the grantor of the Trust and its named trustee.  The Trust was purportedly funded by the nominal consideration of $1.00 and property as set out on a "schedule A," *see id.* at § 1.02, though no such schedule A was attached to the Trust document.  That document indicated, however, that the grantor[5] could name the Trust as beneficiary of life insurance policies[6] and deposit or devise other property into the Trust.

### 1.    Trust beneficiaries

Debtor and Defendants asserted and repeatedly emphasized that the Trust was created for the benefit of Debtor's children, Caleb and Hannah.[7]  Indeed, the

---

[4]  Debtor was suspended in July 2012 for three years.  *Idaho State Bar v. Clark*, 283 P.3d 96 (Idaho 2012).

[5]  Debtor was the sole grantor of the Trust.  The first paragraph of the document refers to Debtor as a "single man."  Indeed, Debtor's statement of financial affairs showed he was divorced, and "previously married to Stacy Thomas from 10/1991 to 9/1996."  Case No. 12-00649-TLM, Doc. No. 42 at 46.  Though single at the 2008 creation of the Trust, the provision for providing additional property to the Trust indicates that the "grantor, *or either of them*," may deposit such property.  Similar problems with use of the plural in connection with the grantor are found throughout the document.  Debtor blamed this on using a form and not adequately reading and proof-reading the same.  In light of the sheer number of errors (of this and other sorts) that permeate the Trust agreement and related documents, and to simplify and ease the reading of this Decision, the Court will not use "[*sic*]" when quoting from the same.

[6]  There was no proof that he had done so.

[7]  The Trust appeared through counsel and defended this matter.  In briefing, the Trust raised an issue about the Trust beneficiaries, Caleb and Hannah, not being parties to this litigation.  However, the Trust never filed a motion to address this perceived issue, and neither Caleb nor Hannah filed anything raising it.  The Court deems the argument waived or abandoned.  Further, the gist of the assertion runs counter to the holding in *Christensen Family Trust v.*

(continued...)

MEMORANDUM OF DECISION - 4

Trust clearly was to be administered for Caleb and Hannah *at Debtor's death*.  The

Trust agreement at Article III, § 3.01, entitled "Trusts for Benefit of Grantor's

Issue," provides that "After the death of the Grantor, the successor trustee[8] shall

hold, manage, and administer the property that is directed to be distributed in

accordance with the provisions of this Article IV for the benefit of the deceased

Grantor's issue as follows . . . ."  It is in such section (and only in that section) that

Caleb and Hannah are specifically named, and the Trust makes provisions for

distribution to them only if they survive Debtor by more than 30 days.[9]

The 2008 Trust agreement, however, made no provision for Caleb and/or

Hannah to receive any distributions or benefits while Debtor was alive.  Debtor

testified that Caleb and Hannah were quite young (4 and 2 respectively) when he

and their mother divorced, and appeared to suggest that it was for this reason he

created the trust to provide estate planning and protection for them.  As of trial,

which occurred only about 6½ years after the Trust's creation, Caleb was on active

duty with the U.S. Marine Corps and Hannah was a college student.  Other

evidence indicates Caleb was 18 years old when the Trust was amended in 2010.

---

[7] (...continued)
*Christensen*, 993 P.2d 1197, 1201 (Idaho 1999).

[8]  Debtor was the initial trustee as well as the grantor, and § 4.04 of the Trust dealt with
successor trustees only on Debtor's death, disability or resignation.

[9]  *See* Ex. 100 at § 3.01A.  While there are other distributive provisions under § 3.01B,
they are also linked to Debtor's death, and address a situation where Caleb and/or Hannah survive
Debtor and are not yet 30 years old at the time of his death.

MEMORANDUM OF DECISION - 5

*See* Ex. 101 at 1. He would therefore have been 16 at the Trust's creation, and Hannah would have been 14.

The Trust agreement does contain provisions relating to the health, education, support and maintenance of a "beneficiary." *See*, *e.g.*, *id.* at § 4.09. But other than in regard to the requirement in Article III that "*after the death of the Grantor*, the successor Trustee shall hold, manage and administer the property . . . *for the benefit of the deceased Grantor's issue*," there is no identification in the Trust document of either Caleb or Hannah (or any other party) as a "beneficiary."

However, the agreement did provide immediate benefits to Debtor as Grantor. It states: "[w]hile both Grantor are living, the Trustee *shall* distribute *to or for the benefit of the Grantor* such sums from income and principal *as the Grantor may at any time request*." Ex. 100 at § 2.01 (entitled "Withdrawals by Grantor") (emphasis added). In addition to this mandatory obligation to distribute whatever the Grantor might request, the Trust's trustee (also Debtor) had the discretionary power to "distribute to or for the benefit of the Grantor, such sums from income and principal as the Trustee deem reasonable for the maintenance, support, and health of either or both Grantor." *Id.* at § 2.02 ("Distributions by Trustee") (emphasis added).[10] The Trust agreement also had a spendthrift clause.

_____

[10]   In the chapter 12 case, Debtor claimed on schedule B a beneficial interest in the Trust worth $150,000. Doc. No. 42 at 9 (filed May 3, 2012). When questioned at trial, Debtor characterized this as a "contingent" interest, and stated that he "guessed it would be an estimate of [his] future rights as beneficiary of the trust" and of the value of the Trust's discretionary power to

(continued...)

MEMORANDUM OF DECISION - 6

*Id.* at § 4.03.[11]

## 2.    Revocability and amendment

The Trust was characterized as irrevocable and, further, not subject to

amendment: "This trust shall be irrevocable and shall not be revoked or terminated

by Trustor or any other person, nor shall it be amended or altered by Trustor or

any other person." Ex. 100 at § 1.04.[12] But notwithstanding this absolute

prohibition on both revocation and amendment, § 5.01 of the Trust agreement

provided:

> *The Grantor may at any time* during their joint lives *amend any
> of the provisions* of this Clark Farms Family Trust by an instrument
> signed by both Grantor and delivered to the trustee.  . . .
>
> During the joint lives of the Grantor, *the Trust* created by this

---

[10] (...continued)
provide sums needed for his maintenance and support.  After conversion, he amended schedule B
to disclaim any interest in the Trust.  Doc. No. 336 at 7 (filed August 7, 2013).

[11]    That clause states:

> Neither the principal nor the income of any trust herein created shall be
> liable for the debts of any beneficiary or issue of a beneficiary; nor shall the same
> be subject to seizure by any creditor under the writ of proceedings at law or in
> equity, or bankruptcy proceedings, or other legal process.  No beneficiary or issue
> of a beneficiary shall have the power to sell, assign, transfer, encumber, or in any
> other manner to anticipate disposition of his or her interest in the trust estate or the
> income produced thereby. As used in this Section 5.03, the word "beneficiary" shall
> refer to any individual having a beneficial interest in the Trust and not merely to an
> individual that the Trust may specifically identify as a "beneficiary.

[12]    "Trustor" is not a defined term in the agreement but, generally, is someone who
creates a trust.  *See* BLACK'S LAW DICTIONARY 1750 (10th ed. 2009).  *See also* Amy Morris
Hess, George Gleason Bogert & George Taylor Bogert, THE LAW OF TRUSTS AND TRUSTEES § 41
(3d ed. 2000) (hereafter "Bogert") (settlor, trustor and grantor are synonymous).  Trustor and
Grantor, as used in the Trust, both refer to Debtor.

MEMORANDUM OF DECISION - 7

Clark Farms Family Trust *may be revoked, in whole or in part*, with respect to community property, by an instrument signed by either Grantor and delivered to the Trustee and the other Grantor, and, with respect to separate property, by an instrument signed by the Grantor who contributed the separate property and delivered to the Trustee. Upon revocation, the Trustee shall distribute all or the designated portion of the community property to the Grantor and the separate property to the Grantor who contributed such property.

Upon the death of the Grantor, Trust B shall become irrevocable. The Grantor may amend or revoke Trust A, in whole or in part, by an instrument signed by the Grantor – and delivered to the Trustee; and upon such revocation, the Trustee shall distribute all or the designated portion of Trust A to the Grantor.

*See* Ex. 100 at § 5.01 (emphasis added).[13]

The trust agreement was amended on May 24, 2010. Ex. 101. This was done by Debtor as the grantor of the Trust, under the power of amendment "reserved to the Grantor under Article 5.01 of the . . . Trust." *Id.* at 1. This amendment refers to Caleb as one of two beneficiaries, and notes he reached the age of 18 and graduated from high school, thus motivating the amendment. The asserted purpose of the amendment was to "add meaning and clarity to this Trust, and give the Trust and more definite purpose as needed for the beneficiaries."

The amendment changes § 1.02 of the Trust agreement to reflect that the "Trust property is now known to be all the assets of Clark's Crystal Springs Ranch LLC, an Idaho limited liability company. The Trust is the sole member of this

---

[13] "Trust A" appears to be a reference to § 3.01A and "Trust B" a reference to § 3.01B. As noted previously, both address distributions at the time of Debtor's death, and differ depending on the ages of Caleb and Hannah at such time.

company.  The assets of the LLC are primarily farm machinery and vehicles owned by the LLC, all of which have accumulated since the formation of this Trust." *Id.*[14]  The value of the LLC assets was asserted to be at least $100,000 and the trustee was required to maintain this "minimum value."

The 2010 amendment modified § 2.02 of the initial agreement (which, as noted above, provided for distributions solely to the Grantor).  This amendment states: "Distributions may be made to the Grantor but only if they do not interfere with regular distributions to the beneficiaries as outlined below and only if they do not reduce the total value of the class of assets as set forth in Section 1.02 above."

The amendment also modified § 4.09 of the Trust.[15]  It states that "[t]he Trust shall continue to make contributions to the beneficiaries *as already provided*." (emphasis added).  However, the sole "contributions" (*i.e.*, in context here, "distributions") to beneficiaries "already provided" for in the original Trust

---

[14]  As the "sole member" of the LLC, the Trust's economic interest in the "assets" of the LLC was not a direct ownership interest in or of such assets, nor were the "assets of [the LLC]" the "Trust['s] property."  Rather, the Trust's interest was in whatever net equity might exist in such assets after satisfaction of LLC debt.  *See* Idaho Code § 30-6-104(1) (an LLC is an entity distinct from its members); § 30-6-502 (addressing member's "transferable interest"); § 30-6-502 at Official Comment ("A member's rights in a limited liability company are bifurcated into economic rights (the transferable interest) and governance rights[.]"); § 30-6-708 (addressing order of distribution of LLC assets to creditors and, only then, to members' non-creditor interests).  The inapt references in this 2010 document—*e.g.*, that the Trust's property consists of "all the assets" of the LLC—are the first in a long line of similar statements and acts of Debtor conflating and confusing the nature of the Trust's and the LLC's interests.

[15]  That section, *see* Ex. 100 at 11–12, provided rules of construction "whenever provision is made . . . for payment [of]" health, education, support or maintenance of a beneficiary.  However, as noted, there were no identified beneficiaries under the initial Trust agreement.

MEMORANDUM OF DECISION - 9

were to be made only upon Debtor's death.  Under the original agreement, nothing was distributable to Caleb or Hannah while Debtor was alive, thus there was nothing to "continue[]."

The next part of the § 4.09 amendments states: "In addition, so long as the Trust is able to earn income through the operation of the LLC as stated above, the Trust shall also provide the beneficiaries with a cell phone and pay all reasonably cell phone billings, pay for the utilities and rent of a reasonable dwelling, or housing, in the event either beneficiary is not able to find and maintain gainful employment, at no fault of their own, provide a vehicle necessary for transportation needs, cover repairs and unexpected vehicle expenses, and provide vehicle liability insurance.  In addition, at the time a beneficiary reaches the age of twenty five (25) that beneficiary will be entitled to a payment of $500.00 per month so long as there is sufficient income from the operation of the LLC business as stated above."  Ex. 101 at 2.[16]

The amendment also stated, in regard to § 5.01 dealing with revocation and amendment, that "[u]nder no circumstances may the Grantor or Trustee be able to revoke the Trust except as set forth in Section 3.02."  *Id.* at 2.[17]  However, since

---

[16]  The amendment thus attempted to create or provide for the first *inter vivos* distributions to the children as beneficiaries.

[17]  Debtor executed a loan document with U.S. Bank bearing signature addenda reciting that the Trust, as member of the LLC, was "an Idaho *Revocable* Trust."  Ex. 220 (emphasis added).  The addenda, however, were executed in March and April 2010, prior to the May 24, 2010 Trust amendment.

MEMORANDUM OF DECISION - 10

§ 3.02 of the Trust agreement concerns "failure of remainder" and does not concern revocation at all, the reference to that section is meaningless and the "except" clause is nugatory. The balance of the 2010 amendment language to § 5.01 thus seems to prohibit revocation of the Trust. And so, too, does § 1.04, quoted earlier. Plaintiff argues that § 5.01 of the original Trust agreement still allows Debtor to amend the Trust agreement and the 2010 amendment does not eliminate that right, thus, it is conceivable that it could be amended again to make the Trust revocable. But Defendants argue that doing so after 2010 would contravene both original (and unamended) § 1.04 if not the amended § 5.01.

### 3.    The trustees

Debtor was the initial trustee of the Trust. Under § 4.04 of the Trust agreement, the trustee could resign on 30 days' notice. That section further provided that "[u]pon the death, resignation, or disability of Jay P. Clark, then Judith Constance (Clark) Appleby shall serve as Trustee of this Clark Farms Family Trust. Upon the resignation of any Trustee, if no successor Trustee is designated, as permitted by this Clark Farms Family Trust, a successor shall be appointed by a court having jurisdiction over the trust with respect to which such Trustee has resigned." *Id.*[18]

On May 31, 2013—the date of involuntary conversion of the bankruptcy

_____

[18]  Appleby is Debtor's sister, and the youngest of six siblings.

MEMORANDUM OF DECISION - 11

case under § 1208(d)—Debtor purportedly resigned as trustee of the Trust.  *See*

Ex. 102 (entitled "Notice of Resignation").[19]  Thus, from its inception in 2008

through at least such date (a period of time including the entirety of the chapter 12

case that was commenced on March 27, 2012), Debtor was the trustee of the Trust

as well as its grantor.

The Notice of Resignation further asserts that the "beneficiaries," Caleb

and Hannah, "have previously retained Jones Financial of Folsom, California to

act as Trustee of their trust effective May 31, 2013."  *Id.*

However, "Jones Financial" was never the trustee.  Jones Financial was

actually a business of Robert Jones.[20]  Debtor testified that Jones, the individual,

was the first successor trustee.  Jones' role as trustee, if ever effective at all, lasted

only a brief time.  He indicated that Debtor contacted him in the late spring or

early summer of 2013 and asked if Jones would agree to act as trustee of the Trust.

Jones was never presented with, and never signed, any documents relating to

assumption of the role of trustee of the Trust.  All documents Jones was asked to

sign were prepared by Debtor, and Jones exercised no independent judgment

regarding the same.  Jones testified he felt he had no real function, and that Debtor

---

[19]  The Order of conversion, Doc. No. 261, was entered of record at 4:37 p.m. on May
31.  Debtor's execution of the notice of resignation was notarized on June 7, 2013, but that notice
asserts it was "effective as of May 31, 2013."

[20]  Jones is in a personal relationship with Debtor's ex-wife, Caleb and Hannah's mother.
Jones developed a stepfather-like relationship with the children.

MEMORANDUM OF DECISION - 12

continued to manage and run both the Trust and the LLC.

The instant adversary proceeding was filed in June 2013. Jones testified that it was Debtor who evaluated the litigation and directed the Trust and the LLC as to their response. And Jones did not engage Defendants' legal counsel, Debtor did. Jones was then, in his words, "removed" as trustee in the summer of 2013 and Appleby became the trustee.

Appleby testified that, when it was realized the Trust agreement specifically identified her as the successor trustee if Debtor were to resign, it made sense for her to serve rather than Jones, who lived outside the region. She did not sign any documents to effect this change, but testified she became the trustee of the Trust and the "manager" of the LLC by September 2013.

Appleby's understanding of the Trust's history and affairs was quite limited. She was, as a Clark family member, generally aware of the existence of Debtor's Trust putatively for the benefit of Hannah and Caleb. She did not read the Trust documents until after she was appointed as trustee. Thus, she primarily relied on Debtor's explanations, input and advice.[21]

### 4.  Operation of the Trust

The Trust never had a bank account, nor was there evidence of any Trust-

---

[21]  Appleby testified that "the Trust owns what the LLC owns" and "the LLC's assets are the assets of the Trust." How she gained this understanding, other than through Debtor's interpretation, was not clear. That she was aware or understood that a member's interest in an LLC is limited, and is not an ownership of the LLC's assets, was not evident.

specific records ever being maintained.  Though it was clear that Debtor, as the grantor/trustee, made distributions to himself or to creditors for his personal benefit, and at some later point directed that certain, much less extensive distributions be made to Caleb and Hannah or for their benefit, all such distributions were made directly from the LLC's funds.[22]

There were no Trust tax returns.  Nor was the Trust referred to in Debtor's tax returns.  *See* Exs. 109–112.  That was the case until September 13, 2013, some three months after the commencement of this adversary proceeding.  On that date, IRS Form 1041 returns "for an estate or trust" were filed by the Trust for 2009, 2010, and 2011.  Exs. 113–116.  Each was signed on that date by Debtor as trustee for the Trust for those past years.[23]  They were prepared by Debtor's accountants, Lunsford & Peck, LLC, and contained no financial information whatsoever but only a statement indicating that, as a "grantor trust," the income is taxable to the grantor.  *Id.*[24]

---

[22]  As discussed further below, such distributions were made in several forms (*e.g.*, cash withdrawals to Debtor including electronic funds transfers, checks payable to Debtor, checks or other payments made directly to Debtor's creditors or others at his behest, etc.) and—to the extent they were recorded—they were listed in the LLC's QuickBooks account entitled "Jay's income (owner draws)." *See* Ex. 106.

[23]  Yet Debtor was no longer the trustee of the Trust, having resigned earlier that year.

[24]  The statement indicates that "[a] statement of income, deductions, and credits is attached."  Those attachments consist of two pages.  One identifies Debtor as the grantor.  The other is a form stating: "The following income, deductions and credits are to be reported on the income tax return of the above named grantor," but it contains no further or "following" information.  The subject of taxes is discussed further, *infra*, in connection with the LLC.

MEMORANDUM OF DECISION - 14

## C.    The LLC

About two weeks after the creation of the Trust, articles of organization of the LLC were filed with the Idaho Secretary of State.  Ex. 104 (filed February 14, 2008).  Debtor signed the documents, and he was disclosed as the initial registered agent.  The form indicates the LLC is "member-managed."  The form requires disclosure of at least one member for such an LLC, and the Clark Farms Family Trust is shown as that member.  *Id*.[25]  The LLC's operating agreement also bears the February 14, 2008 date, and it discloses the Trust as the sole member and manager of the LLC.  Ex. 103; *see also* Ex. 241 (same).[26]  That operating agreement recites that the duration of the LLC shall be "as directed by

---

[25]  The signature "of at least one person responsible for forming" the LLC is also required, and Debtor signed it, and indicated his "capacity" as "Attorney: Clark Farms Family Trust."  *Id*.

[26]  The 2008 operating agreement recites that the Trust shall make capital contributions within "thirty days after demand made" and indicates such contributions are $100,000 for a management contribution and $27,010 for a capital contribution.  Ex. 103 at 6–7.  No evidence was provided to establish when (or if) the "demand [was] made" or when (or if) those initial contributions were provided.

  In regard to the LLC's financial condition, the 2010 Trust amendment suggests the LLC had "accumulated" at least $100,000 worth of farm machinery and vehicles prior to the amendment.  Ex. 101 at 1.  However, the equipment held by the LLC resulted, at least to a significant degree, from a "lease" from Debtor's parents.  Ex. 123 (equipment lease between the LLC and John and Constance Clark "made and effective January 14, 2008").  No other evidence was presented regarding the LLC's purchase or ownership of other equipment.  (The lease provided that any additional equipment owned by the LLC would be collateral to Debtor's parents in lieu of his parents charging the LLC a higher "deposit" under the lease.)  Additionally, the asserted "made and effective" date of the lease between the LLC and Debtor's parents preceded the formation of the LLC by one month.  Further, the lease document was executed by Debtor and his parents in early March 2012, just three weeks before Debtor filed his chapter 12 petition.

MEMORANDUM OF DECISION - 15

beneficiaries of Clark Farm Family Trust, Caleb + Hannah Clark." *Id.* at 2.[27]

The structure, therefore, was that the LLC was a single member, member-managed limited liability company, and its sole member and manager was the Trust. Debtor was individually neither a member nor manager of the LLC.[28]

### 1.    Operation of the LLC

From inception in February 2008 through May 31, 2013, Debtor exercised total and sole control over the LLC's operations. There was no evidence that any individual other than Debtor had any substantive or significant role in the LLC's affairs during this period.[29]

Certain documents used by the LLC bore the name of the LLC. *See*, *e.g.*, Exs. 202–203 (checking account statements); Ex. 218 (unsigned billing statements issued to Dan Mori); Ex. 123 (the "2008" equipment lease between the LLC and Debtor's parents).[30] There were even a few documents that reflected the Trust was

---

[27] Nothing in the Trust agreement, or the 2010 amendment, Exs. 100 and 101, purports to grant any such directive power to beneficiaries.

[28] Debtor filed annual reports with the Secretary of State for the LLC. They were consistent in showing the Trust as the member of the LLC, but showed Debtor's capacity in signing the reports in various ways. One indicated he was both "trustee" and "attorney." Later ones identified him as "trustee for member" (once), as "member" (once) and as "manager" (twice). When Appleby signed the 2013 report, she indicated her title as "trustee/manager." Ex. 104.

[29] There was a bookkeeper, Jennifer Epis, as well as other employees of the LLC, such as truck drivers. None were shown to have any management authority.

[30] Plaintiff challenged the characterization of the John and Constance Clark transaction as a lease and contended the LLC had purchased the equipment. The issues between Plaintiff and Debtor's parents were settled. *See* Case No. 12-00649-TLM, Doc. Nos. 463 and 477. Under their agreement, which also resolved Adv. No. 13-06037-TLM, Debtor's parents agreed not to

(continued...)

the LLC's member.  *See* Ex. 220 (UCC-1 financing statements for 2010

transaction with U.S. Bank).[31]

Other documents, however, while reflecting the LLC as a party, had

varying disclosures as to the identity of the LLC's member or manager, and/or to

the capacity in which Debtor was signing.  *See*, *e.g.*, Ex. 224 at attach. (CNH

Capital's transaction documents with the LLC, signed by Debtor as the LLC's

"manager"); Ex. 226 (crop share lease between Barber Caven Ranches as lessor

and "Clark's Crystal Springs Ranch LLC, an Idaho Company (solely operated and

managed by Jay Clark)" as lessee, which is also signed by Debtor as "manager"

for the LLC); Ex. 238 (John Deere contract and security agreement with Debtor

and the LLC as co-borrowers; the LLC execution reading "Clark's Crystal Springs

Ranch, LLC By: Jay P. Clark, manager").

The evidence as a whole reflects that Debtor, even though he was an

attorney, and even though he structured the LLC as a single-member limited

liability company with the Trust as the sole member, repeatedly and consistently

failed to honor that structure, and many times would not only ignore or elide the

---

[30] (...continued)
dispute the underlying transaction was a purchase and sale, not a lease, assuming the LLC was
consolidated with Debtor's estate.

[31]  Not only are the bank's documents clear in identifying the LLC as the debtor in the
subject secured transaction, a "name and signature addendum" reads "Clark's Crystal Springs
Ranch, LLC, By: Clark Farms Family Trust, an Idaho Revocable Trust, Member, by: Jay Phillip
Clark, Trustee."  *Id.*  The Court views the precision shown in this particular document as a
consequence of the creditor's diligence and attention.  The evidence as a whole does not suggest
Debtor or the LLC ever insisted on, or even regularly provided, such clarity.

MEMORANDUM OF DECISION - 17

Trust's role but specifically identify himself as the member and/or manager of the

LLC.  The evidence indicates Debtor disclosed these structural

details—explaining his capacity as trustee of the Trust that was in turn the member

of the LLC—only when required by diligent or careful lenders.

The blurring of identity and capacity is not limited to the transactional

documentation used with creditors.  Debtor filed his chapter 12 petition as "Jay P.

Clark, DBA Crystal Springs Ranch."  Case No. 12-00649-TLM at Doc. No. 1.[32]

Even as recently as October 21, 2014, Debtor, in pursuing an objection to the

claim of creditor Murphy Land Company ("MLC"), filed a paper that commences:

"COMES NOW the debtor, Jay P. Clark, *individually and doing business as*

*Clark's Crystal Spring Ranch, LLC*, by and through his attorney of record[.]"  *Id.*

at Doc. No. 555 (emphasis added).

Debtor also conflated the LLC's assets and his own in his bankruptcy

schedules.  For example, he listed as "personal property of the debtor" several

LLC checking accounts.  Case No. 12-00649-TLM, Doc. No. 42 at 4 (sched. B).

He also listed crops consisting of 1,124 acres of wheat (worth $451,848.00) and

1,150 acres of hay ($832,140.00).  *Id.* at 11.  He did not, however, indicate any

---

[32]  This Court has explained that "DBA" is an abbreviation for "doing business as,"
which is itself a way to indicate an "assumed business name," which is any name under which an
individual, group of individuals or entity holds itself out for the transaction of business in this
State if such name does not include in full the true names of such parties.  *Hopkins v. McCallister
(In re Bar GW Ranch & Trucking LLC)*, 2014 WL 5363807 (Bankr. D. Idaho Oct. 21, 2014)
(citing Idaho Code § 53-503(1)(b)).  Simply put, Debtor cannot "DBA" Clark Crystal Springs
Ranch, LLC.

MEMORANDUM OF DECISION - 18

ownership of real property on which such crops could be grown. *Id.* at 3 (sched. A). His disclosure of leased ground was unclear as to which was the LLC's and which was his. *Id.* at 28 (sched. G). In a later affidavit, Ex. 136, Debtor asserted he personally grew crops, as did the LLC, *see id.* at ¶¶ 8–9, but he did not clarify the situation in his chapter 12 filing.

In testimony, Debtor stated he and his then-attorney, Brent Robinson,[33] knew that crops shown in the chapter 12 schedules were LLC assets, but they were scheduled in his individual case in order to "maximize potential returns to creditors" in the chapter 12. Debtor also testified that his subsequently retained attorney, Gadda, advised him to amend the schedules to come up with a "fair allocation" of the crop value as between his personal estate and the LLC. This was, in Debtor's view, achievable by splitting the interest disclosed in the bankruptcy into two-thirds for the LLC and one-third for Debtor, though it was not shown that such a proposed division had any grounding in actual documents or specific facts.

His statement of financial affairs ("SOFA") indicated Debtor had gross income from the operation of "his" business of $2.4 million in 2011, and almost $1.3 million in 2010. Doc. No. 42, at 41. These figures were not shown to be

---

[33] Debtor's initial chapter 12 attorney, Robinson, was replaced by substitute counsel, Donald Gadda, in August 2013. Case No. 12-00649-TLM at Doc. No. 332. Gadda was granted leave to withdraw in October 2013. *Id.* at Doc. Nos. 396, 406. Debtor has represented himself in the chapter 7 case thereafter for the most part, though Robinson later reappeared for a limited purpose. *Id.* at Doc. Nos. 524–25.

MEMORANDUM OF DECISION - 19

distributions from the LLC, distributions from the Trust, or income from the crops he allegedly personally grew, as distinguished from the gross income of the LLC.

Confusion and inconsistencies regarding the LLC's farming operations and those of Debtor personally are rife in later submissions as well.

In an August 27, 2013 affidavit filed in a state court action, Debtor stated "through CCSR I grew crops on the farm in 2011[.]" *See* Ex. 117 at ¶ 11.[34]  In ¶ 12 of the same affidavit he referred to "the crops that CCSR and I grew in 2012." In part these assertions were intended to support crop liens that both Debtor and the LLC asserted on that property.  Later, in his appellate brief to the Ninth Circuit on the § 1208(d) ruling, Debtor asserted the 2011 and 2012 hay on the 4,000 acres at issue was that of both Debtor and the "Farm Company," a reference to the LLC. Ex. 206 at 12–13.[35]

In testimony, Debtor asserted that the Hilliards leased the 4,000 acres to him personally.  He admitted he did not sublease it to the LLC, but argued the LLC was effectively running that farm.  In further questioning, Debtor claimed the hay on this ground was the LLC's, and any references he had made to his personal ownership were just "inartful."

Debtor attempted in testimony to explain that he was only working "for" the

---

[34]  The proceeding was *Murphy Land Company v. Clark*, an Idaho state court action in Owyhee County.  The action, and the "farm" referred to in Debtor's affidavit, concerned a 4,000 acre farm leased by Debtor's father, and then by Debtor, from the Hilliards.

[35]  At one point in this brief, however, there is also a reference to the LLC as the "Debtor's company."  *Id.* at 17 (page citations are to the brief's own pagination).

MEMORANDUM OF DECISION - 20

LLC and he did not have personal farming operations.  Then, during testimony

later in the trial, Debtor stated he "personally" farmed the 4,000 acre Hilliard

property, rented and farmed another 2,500 acres belonging to his parents, and

rented and farmed another 1,500 acres belonging to Jerry Caven.  Debtor also

indicated in an earlier affidavit that in the fall of 2011 he "planted around 1,123

acres of winter wheat."  Ex. 117 at ¶ 27.  In testimony, though, he attempted to

distance himself from this assertion, and said it was the LLC that did so.  He tried

to explain, repeatedly, that the misstatements in affidavits and other documents

were all simply errors caused by lack of attention, focus or proofreading.

It is extremely difficult to distinguish the farming done by Debtor

individually[36] and that done by the LLC with Debtor as either its "farm manager"

or as an employee of that entity.[37]  The facts surrounding the farming were varied

and inconsistent.  Debtor's testimonial assertions were as well and, by and large,

appeared motivated by the strategic needs of the moment.

### 2.    Assets of the LLC

The evidence makes identification of the LLC's assets at any given moment

in time a difficult task.  In general, the LLC possessed farm equipment most of

---

[36]  Debtor noted that he did very little legal work after 2007, and he was in an inactive status with the Idaho State Bar in early 2010.  *See* Ex. 117 at 11.  He characterized himself as a "farmer" after that.

[37]  Debtor testified that he "worked for" the LLC and was paid for his labors by the amounts paid directly to him, or to his personal creditors (or others) for his benefit, out of the LLC accounts.  Appleby testified that Debtor was paid $59,000 to $70,000 per year for such labor.  Several aspects of these distributions are discussed later.

MEMORANDUM OF DECISION - 21

which, as noted earlier, was putatively leased from Debtor's parents. *See* Ex. 123

(the "January 14, 2008" lease executed on the eve of the chapter 12 filing); *see*

*also* Case No. 12-00649-TLM at Doc. No. 42 (sched. G). But documents admitted

at trial indicate the "leased" equipment was depreciated on Debtor's tax returns.

According to Debtor's accountant, the operations of the LLC merely passed

through to Debtor and were reported on his personal tax returns. *See*, *e.g.*, Ex. 109

(Debtor's tax return for 2009). But given a situation where the LLC allegedly

"leased" the equipment from Debtor's parents, one would expect the LLC's lease

expense to be shown on Debtor's tax returns, not a depreciation of "used

equipment" on depreciation schedules. *See*, *e.g.*, Ex. 109 at Bates 0010 (internal

IRS sched. F entitled "Profit or Loss From Farming") (showing $6,639 in

equipment lease expense), and at Bates 0011 (showing $111,234 in depreciation),

and Bates 0020-21 (supporting depreciation schedules).

In response to discovery that requested identification of the LLC's assets,

Defendants stated the LLC "owns" farm machinery and provided a list of that

machinery. Ex. 139 at 17–18. That list, admitted as Ex. 140, itemizes equipment

with an auction value of $364,600. *See also* Ex. 107 (the LLC's QuickBooks

report summarizing "purchased" farming equipment from John Clark of

$203,192.92 and "other" used equipment of $560,928.72).

The LLC has also asserted ownership rights to $354,000 in 2013 crop

insurance proceeds. In July and August 2013, Debtor "assisted" Jones and/or

MEMORANDUM OF DECISION - 22

Appleby as trustees of the Trust to complete claims on crop insurance policies.  In October 2013, Plaintiff learned that crop insurance checks were being issued by Northwest Farm Credit Services ("NWFCS").  Debtor sought to have the check mailed to the LLC's post office box, where he would obtain and deposit that check, ostensibly because neither Jones nor Appleby had access to the LLC's post office box.[38]  Plaintiff intervened, and NWFCS still holds possession of the check pending the outcome of this proceeding.  *See* Ex. 119 (letter and copy of check).

Appleby testified that the LLC's assets consisted of a $20,000 checking account (frozen by an injunction entered at the outset of this adversary proceeding), the $354,000 crop insurance proceeds check, and farm equipment that she had not inventoried located on "the 13 acres."  The equipment was also subject to the preliminary injunction.

### 3.    "Management" of the LLC

The Trust was the sole member of the "member-managed" LLC and, up to the filing of the chapter 12 and thereafter to its conversion, Debtor served as trustee of the Trust and he also directed all activities of the LLC.  No other individual filled those roles.

Debtor did not regularly disclose that his acts were taken as trustee of the Trust, or that the Trust was the member managing the LLC.  In point of fact, he

---

[38]  By this time, Appleby had been installed as trustee.  Given the nature of the then-pending litigation, and given Debtor's awareness of the assertions of Plaintiff and creditors, that Debtor continued to act "for" the Trust and the LLC in this way was hubristic.

often characterized himself as the "manager" of the LLC.  Debtor now argues he meant he was the "farm manager" or he used the term "manager" in a common or occupational sense, and not as used in the limited liability statutes.  That those dealing with Debtor were aware of that suggested nuance and aware of with whom they were dealing (an LLC or the Debtor as an individual who claimed to "do business as" Clark's Crystal Springs Ranch) was not established.

Debtor resigned as trustee of the Trust, putatively as of the end of May 2013.  Appleby became the trustee sometime thereafter.[39]  Appleby thus had no direct knowledge of the operations of either the Trust or the LLC until the fall of 2013, after this adversary proceeding had commenced.  And, since the time she assumed the role of trustee for the Trust, and effective control of the LLC, she indicated she has relied on Debtor's historical knowledge, "expertise" and ongoing assistance.  Though Appleby was forthright in responding to questions and generally credible, the evidence did not establish her independence as a trustee or farm manager and, given the date when she assumed her duties, she could provide little probative evidence as to the material financial transactions of the LLC or Trust, all of which preceded her involvement as trustee.

---

[39]  As noted earlier, Appleby's "appointment" as successor trustee occurred in September 2013.  By that point, an injunction had been entered freezing the Trust's and LLC's assets.  *See* Adv. Doc. Nos. 5 (TRO, entered June 10, 2013); 16 (preliminary injunction, entered June 24, 2013).  There were consequently no farming "operations" thereafter, even though Debtor attempted to procure the crop insurance proceeds "for" the LLC.

MEMORANDUM OF DECISION - 24

4.    **The LLC's payments to Debtor or to others for his benefit**

The business affairs of the LLC were documented internally through QuickBooks software and related documents.  Jennifer Epis testified that she was the LLC office manager and bookkeeper starting in 2011.  She handled the LLC's bank accounts and paid the LLC's bills.  She sorted and categorized income and expenses for QuickBooks, and she handled the payroll for LLC employees.

Epis used a QuickBooks account to track the payments made directly to Debtor, or those made to third parties on Debtor's behalf.  These were all credited in a QuickBooks account titled "Jay's Income (owner draws)."  *See* Ex. 106.

While Debtor testified he was "employed by" the LLC, he drew no salary or wage.  His sole compensation came through "draws" from the business.[40]  The same were reflected in Ex. 106.  The "draws," however, were mostly after-the-fact characterizations of payments that had been previously made from LLC checking accounts.[41]

The checks from the LLC checking accounts reflected in the "Jay's Income

---

[40]    An individual who is the sole member-manager of an LLC often takes "draws" rather than wages or salary.  Here, the only member of the LLC was the Trust.  The "Trust" took no distributions from the LLC, and the Trust had no bank account in which to put them.  The Trust, if it had taken distributions from the LLC, could in turn distribute some or all to the benefit of Debtor as Grantor, at his sole request under the terms of the Trust or, after 2010, pay Caleb and Hannah.  But the process here elided the LLC-Trust structure entirely.  Money exited the LLC to Debtor or in payment of Debtor's personal debts, and at times to or for the benefit of his children.  The accounting for it all–to the extent it existed–was solely in the QuickBooks "Jay's Income (owner draws)" account.

[41]    Debtor attempted to put the onus on Epis to the extent there was any arguable "misclassification" in QuickBooks.  This deflection of responsibility was not persuasive.  He had the ability, exercised or not, to review all the categorization(s), and in fact used the QuickBooks "Jay's Income (owner draws)" report in preparing his taxes.

MEMORANDUM OF DECISION - 25

(owner draws)" category of the LLC's QuickBooks were used to pay Debtor's student loan; his personal credit card; his support obligations to his ex-wife; his personal travel expenses; tuition and travel expenses for a prior employee with whom Debtor had a personal relationship; Debtor's medical expenses; mortgage payments for Debtor's residence, for a rental house Debtor owned, and for housing expenses (rent) for Caleb and Hannah;[42] wedding expenses, including a ring, related to Debtor's remarriage; attorneys' fees for Debtor's personal bankruptcy; and other things.[43]

From March 4, 2008, to June 17, 2013, the LLC paid Debtor or Debtor's creditors, and to a lesser degree Caleb and Hannah or their creditors, a net amount of $399,843.68 according to the "Jay's Income (owner draws)" report, Ex. 106. The form of distribution (check, electronic transfer, payment of credit card charges, ATM, cashiers' check, etc.) varied.

The distributions in the one year prior to bankruptcy, from March 27, 2011, (a net balance shown in Ex. 106 as of that date of $269,997.95) to March 27, 2012, (a net balance as of that date of $335,182.31) totaled $65,184.36. *Id.* at 6–10. This is inconsistent with Debtor's SOFA disclosures of prebankruptcy

---

[42]  Ex. 108 shows payments on "rental house and house mortgage." The payments to CitiMortgage were on a rental house owned by Debtor personally, and those to Wells Fargo were on his personal residence, and those to Bank of America were for the "Eastgate" property in Boise where Caleb and Hannah resided. None of these were LLC real property assets.

[43]  *See also* Doc. No. 96 at 5–6 (Plaintiff's closing brief) (itemizing certain payments in 2012 and 2013 prior to conversion to chapter 7 by date and amount and referencing evidence).

MEMORANDUM OF DECISION - 26

income.  *See* Case No. 12-00649-TLM, Doc. No. 42 at 41 (disclosing no income

in 2012, and $2,407,371.35 in 2011 income "from operation of business").[44]

In addition, the QuickBooks report does not comport with the "earnings

statements" Debtor filed in an attempt to comply with Fed. R. Bankr. P. 1007.  *See*

*id.* at Doc. Nos. 47, 47-1.  The Rule 1007 filing contains a "print out of the draws

received by debtor during the six months immediately preceding the

commencement of this case."  It shows twelve payments made to Debtor for the

six months from September 27, 2011, through March 27, 2012, totaling

$10,650.00.  Of the twelve payments, eight also appear on Ex. 106.  But, in

contrast to his Rule 1007 submission, the total payments to or distributions for the

benefit of Debtor as shown on the QuickBooks for this same six-month period was

roughly three times higher, totaling $39,313.97.  *See* Ex. 106 at 7–10.

### 5.    Liabilities of the LLC

In discovery, Defendants were asked to identify all liabilities of the LLC.

Ex. 139 at 18.  They did so with a list admitted as Ex. 129.  That list includes the

following creditors and amounts owed:

Bingham Cooperative (CHS) ($32,565.19)
Idaho Power ($535.02)
John Deere Credit ($6,680.30)
Deere and Company (approx. $10,000.00)
LM Davenport ($16,713.83)
Mid Valley Dairy ($9,272.20)

---

[44]  For clarity, while Debtor's sworn SOFA represented no income at all in 2012, the
QuickBooks report for "Jay's Income (owner draws)" showed $17,644.03 in draws and payments
in that portion of 2012.  Ex. 106 at 9–10.

MEMORANDUM OF DECISION - 27

Scott Clark ($6,000.00)
Van Boven Calf Ranch ($60,000.00)
Wells Fargo Bank ($94,304.76)
U.S. Bank (approx. $34,000.00)
John Clark ($295,000)
Jennifer Epis ($4,575.00)
Simplot's ($34,643.86)
CNH Capital ($17,931.82)
Jerry Caven (approx. $50,000.00)

The total amount of such LLC debts is alleged to be $676,796.98.[45]

Defendants asserted that Debtor was also personally responsible for all these listed

debts except Wells Fargo Bank, U.S. Bank, Scott Clark and Mid Valley Dairy.[46]

### D.    Taxes

Ed Gabriel of Lunsford & Peck, LLC, a CPA firm that prepared several

years' returns for Debtor, testified that for tax purposes it is desirable to avoid a C

corporation and instead achieve "single-level" taxation.  For a single member

LLC, this would mean disregarding the LLC and reporting income, profit and

losses, depreciation of assets[47] and other relevant information on the individual

---

[45]   Many of these creditors, particularly those who have filed proofs of claim in Debtor's
case, appear to have collateral for their claims.  The total amount of unsecured liability cannot be
accurately calculated from the exhibits of record.

[46]   Not withstanding these assertions, Debtor's schedules show liquidated, undisputed
and noncontingent liability of $33,600 to U.S. Bank, *see* Case No. 12-00649-TLM, Doc. No. 42
at 18; $9,272.20 to Mid Valley Dairy, *id.* at 26; and $6,000.00 to Scott Clark, *id.* at 26.  In a post-
conversion amendment, Debtor noted he "personally guaranteed" the Scott Clark debt.  *Id.*, Doc.
No. 336 at 20.  There are several Wells Fargo Bank debts scheduled, but Debtor has filed an as-
yet unadjudicated objection to the Wells Fargo Bank proof of claim of $94,304.76.  Debtor did
admit during hearing that he was jointly or co-liable for more LLC debts than the five creditors he
disclosed in his schedule H, *see id.* Doc. No. 42, at 30, and Ex. 129 confirms that schedule H was
incomplete.

[47]   Gabriel was not specifically questioned whether the depreciation of LLC assets on
(continued...)

MEMORANDUM OF DECISION - 28

member's returns.

Debtor's returns were introduced as Exs. 109–112.  They showed farming income, profit and loss, and net operating loss (NOL) calculations consistent with the general approach discussed by Gabriel.[48]

However, Debtor was not the member of the LLC; Gabriel acknowledged that the sole member of the LLC was the Trust.  Still, the accounting firm prepared only one return—Debtor's—because, as Gabriel explained, the Trust was a "grantor trust."  He testified that in his firm's view, the LLC interests flow to the Trust, and the Trust's interests—because it was a grantor trust—flow to Debtor, resulting in the need for only an individual return.  He acknowledged that an "informational" return for the Trust was also required.  According to Debtor, these Trust informational returns were "overlooked" for several years before they were filed in September 2013.[49]

However, Gabriel's testimony that the affairs of the Debtor, the LLC and

---

[47] (...continued)
Debtor's return should include depreciation of farm equipment allegedly not owned by the LLC but instead leased to the LLC.  The underlying lease, Ex. 123, did not purport to allow such, instead indicating that ownership was solely and exclusively in Debtor's parents and Debtor has no "right, title or interest therein or thereto."  *Id.* at 5.

[48]  The 2009 return, Ex. 109, does not bear a date of preparation or submission.  The 2010 return, Ex. 110, has a transmittal letter from the firm to Debtor dated November 4, 2011.  The 2011 return was amended because income was improperly classified and reported.  Ex. 111 at 2.  There is a transmittal letter to this return dated September 9, 2013.  *Id.* at 12.  The 2012 return, Ex. 112, lacks indication of date.

[49]  As noted earlier in this Decision, these returns of September 2013 provide limited actual "information."  *See* Exs. 113–115.  Gabriel was not the professional in the firm involved in preparation of these returns.  *Id.*

MEMORANDUM OF DECISION - 29

the Trust were properly handled for tax purposes did not validate how Debtor

dealt with these matters from other perspectives.  Gabriel made clear that the

advice given Debtor by his firm was limited solely to the tax aspects, and Debtor

did not receive advice about the formation and structure of the Trust and LLC, or

legal issues regarding how he should, or did, manage or operate the same.

### E.    Testimonial credibility[50]

Gabriel was a credible witness.  However, as noted, his role was limited.

He could not, and did not purport to, speak to the propriety of how Debtor handled

the day-to-day finances and transactions of the LLC, or to Debtor's treatment and

handling of the Trust.  Further, Gabriel relied on information prepared by and

provided to him by Debtor or the LLC's bookkeeper, Epis, and did not

independently verify the same.

Appleby was generally credible, though at times, she was somewhat

defensive, especially when questioned about specific statements she made in

affidavits prepared by Debtor or by lawyers for her signature.[51]  She admitted both

her lack of first-hand knowledge and her significant reliance on her brother.  In

almost all aspects, her involvement with the Trust and LLC post-dated the

activities that form the crux of the instant litigation.  This goes to the weight that

---

[50] For clarity, the Court notes that it has considered the credibility of all witnesses, and has evaluated the weight to be given their testimony, even where not highlighted in this Decision.

[51] The evidentiary record includes affidavits that were admitted as exhibits.  They are considered as impeachment exhibits, consistent with the approach taken by counsel.

MEMORANDUM OF DECISION - 30

can be given her testimony.

The primary witness for all events during the relevant period was Debtor. And Debtor was not a credible witness on numerous issues of substance. Debtor's blurring of the lines between the Trust's finances and activities, the LLC's finances and operations, and his own personal affairs did not result from what he attempted to characterize as innocent mistake or understandable oversight. He was not an unschooled or unsophisticated businessman attempting to navigate a complicated legal structure thrust on him. He was a lawyer, and he created it.

It served Debtor's purposes to control all aspects of the Trust and LLC without adhering to the legal structure he designed. In effect, he gained the benefits of inserting both the LLC and the Trust between himself and those he did business with, without accepting many—if not most—of the concomitant burdens. His conflation of personal and entity finances and transactions is rife, and continued even into the filings he made under oath in his chapter 12 case.

However, at other times in his testimony, Debtor attempted to emphasize the legal separateness of his personal affairs from those of the Trust and the LLC. The Court finds those assertions not to be principled but, rather, situational. He would assert a clear distinction between himself, the LLC and the Trust when it would benefit him in a specific dispute with Plaintiff, or with certain business creditors. Otherwise, as the evidence shows, Debtor ignored those distinctions.

Debtor at various points argued, expressly or inferentially, that he was

MEMORANDUM OF DECISION - 31

merely confused, or neglectful, or otherwise mistaken when referring to himself as the member or the manager of the LLC, or when evidence showed he conducted farming affairs as if the LLC were his "dba" or sole proprietorship. These assertions were not credible. First of all, Debtor's legal training belies such facile defenses.[52] That is so even if the Court were to acknowledge that Debtor's legal work (such as in the drafting of the Trust agreement) was at times shoddy. This Court found in converting the case under § 1208(d) that Debtor appreciated the legal landscape—including an express ruling of the state court dispossessing him of the subject ground on which hay was to be grown—when he entered into hay production contracts with DeVries and Van Boven, Exs. 127, 128. The Court from the evidence now before it reaches the same conclusion in connection with Debtor's claims that any confusion in his handling of the LLC or the Trust or personal financial affairs was just innocent mistake or lack of care. And it is significant that he perpetuated the commingling and confusion in his bankruptcy filings and his conduct throughout the chapter 12 case, when clarity was paramount.

Further, Debtor's credibility was not enhanced by his evasive and qualified responses to questioning. Several times, he would take a firm and unequivocal position, only to attempt to retract, qualify or explain it away when confronted

---

[52]  As previously noted by this Court, both in finding adequate cause under § 1208(d) to covert the case from chapter 12 to chapter 7, and in holding that the debt to creditor DeVries was nondischargeable under § 523(a)(2), Debtor comes before the Court having had legal training and a law license, even though that license was later suspended.

MEMORANDUM OF DECISION - 32

with impeaching evidence.  This occurred frequently enough to become a pattern.

**DISCUSSION AND DISPOSITION**

Plaintiff bears the burden of showing that the several claims made against the two Defendants—the Trust and the LLC—are well taken and should be sustained.  The overlapping nature of the various causes and the complexity of the evidence requires close attention and focus.

### A.    Sham entities

Plaintiff contends that the creation of the LLC and the Trust was part of a "scheme" of Debtor to hinder, delay and/or defraud his creditors, and that the LLC and the Trust are therefore "sham" and "invalid" entities he may disregard.

The Trust was created in February 2008, and the LLC was formed later the same month and year.  Debtor testified that his intent was to provide some estate planning for Hannah and Caleb.  There was no direct evidence to the contrary.

However, Plaintiff elicited significant testimony and introduced significant documentation to show how Debtor operated, managed and dealt with both the Trust and the LLC in the years following their respective formations in 2008.  Plaintiff suggests this provides preponderating circumstantial evidence that Debtor's design from the outset was to establish a system that would provide financial and legal protection from personal liability while at the same time do business in a way that would ignore the restrictions and burdens attending these

MEMORANDUM OF DECISION - 33

separate structures.[53]

Fully weighed, Plaintiff presented insufficient evidence to establish the "creation" of the Trust and the LLC was part of a "scheme" to hinder, delay or defraud Debtor's creditors. While those could be future as well as then-existing creditors, it must still, per force, focus on evidence of Debtor's intent at the time he created the Trust and the LLC.[54]

The evidence provided to support the contention of Debtor's *ab initio* fraudulent intent is, in effect, the same evidence that shows Debtor failed to respect or attend the legal separateness of the Trust and LLC *after* their formation. But Plaintiff in this cause alleges more than just failure to honor the structure; he contends Debtor created the structure as part of an originally intended scheme. Though the contention is plausible, there was little evidence of Debtor's financial circumstances, conduct or creditor activity in 2008 that sheds light on motive. The Court, on the record before it, cannot draw the additional inference suggested and find the alleged intent was harbored by Debtor from the inception of the Trust and the LLC. This cause of action will therefore be dismissed.

---

[53] Since evidence of a debtor's intent is rarely direct, circumstantial evidence may be considered, and intent inferred from the totality of the circumstances. *See, e.g.*, *Burks v. Bailey (In re Bailey)*, 499 B.R. 873, 888 (Bankr. D. Idaho 2013) (citing *Sharma v. Salcido (In re Sharma)*, 2013 WL 1987351, at *10 (9th Cir. BAP May 14, 2013)), *rev'd* in part on other grounds, 518 B.R. 594 (D. Idaho 2014).

[54] The Ninth Circuit in *Goodrich v. Briones (In re Schwarzkopf)*, 626 F.3d 1032 (9th Cir. 2010), noted that it was well-settled that a trust created with the motive or for the purpose of defrauding creditors is illegal, even if the trust's terms in themselves are perfectly lawful, and that a trust created for such purpose may be disregarded. *Id.* at 1037 (citing 1A Scott on Trusts § 63 (4th ed. 2001)).

MEMORANDUM OF DECISION - 34

### B.    Piercing the veil

After the creation of the Trust and the LLC, Debtor conducted business

with little regard for the legal or financial structures and limitations involved.

Plaintiff seeks on this basis to "reverse pierce" the entities.[55]

### 1.    The use and utility of veil piercing

This Court observed in *Crawforth v. Wheeler (In re Wheeler)*, 444 B.R. 598

(Bankr. D. Idaho 2011):

> "[A]n action to pierce the corporate veil is 'not itself an
> independent . . . cause of action, but rather is a means of imposing
> liability on an underlying cause of action.'" *Semmaterials, L.P. v.
> Alliance Asphalt, Inc.*, 2008 WL 161797, at *3 (D. Idaho Jan. 15, 2008)
> (quoting *Peacock v. Thomas*, 516 U.S. 349, 354, 116 S.Ct. 862, 133
> L.Ed.2d 817 (1996)); *see also Ahcom, Ltd. v. Smeding*, 623 F.3d 1248,
> 1251-52 (9th Cir. 2010) (interpreting California law).
> . . .
> Here, Trustee is not attempting to use veil-piercing in the
> traditional sense.  He does not seek to impose personal liability on
> Debtor for the acts of BW.  Nor is he alleging that the assets of BW
> should be used to satisfy a particular personal liability of Debtor.
> Indeed, Trustee is not seeking to recover, under § 548, from either
> Debtor or BW at all.  Instead, Trustee urges the Court to treat the assets
> of BW, a non-debtor entity, as coextensive with Debtor's assets in
> order to avoid prepetition transfers of BW's assets.  The true essence
> of Trustee's claim is further evidenced by his representation at trial that
> his intent is to bring the assets of BW, as well as L&B, into Debtor's
> bankruptcy estate.  Trustee's approach—collapsing the assets of a non-
> debtor entity into those of the Debtor—is tantamount to a request for
> substantive consolidation of Debtor's estate with that of a non-debtor,

---

[55]  The manner of veil-piercing here asserted is "reverse" veil piercing.  Ordinarily,
"piercing the corporate veil" allows a creditor of a corporation to ignore the corporate form and
seek recovery from the corporation's principal(s).  "Reverse piercing is a method of holding a
corporation liable for the debts of a shareholder."  *Grimmett v. McCloskey (In re Wardle)*, 2006
WL 6811026, at *8 (9th Cir. BAP Jan. 31, 2006) (quoting *SEC v. Hickey*, 322 F.3d 1123, 1130
(9th Cir. 2003)).

BW.

*Id.* at 608.  Similarly, in *Grimmett v. McCloskey (In re Wardle)*, 2006 WL 6811026 (9th Cir. BAP Jan. 31, 2006), the BAP held "an alter ego claim is a remedy that, without an underlying substantive cause of action, does not lead to substantive relief[.]"  *Id.* at *7.  "A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather is procedural.  . . .  'A finding of fact of alter ego, standing alone, creates no cause of action.  It merely furnishes a means for complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation.'"  *Id.*

The Court has been given no compelling reason to depart from this interpretation, which is directly applicable to the sort of "cause of action" asserted by Plaintiff.  Veil-piercing, or reverse veil-piercing, is not an independent cause of action, but is a remedy.  However, as *Wheeler* observed, it can be tantamount to a request for substantive consolidation.  This is a claim expressly made by Plaintiff.  Thus, several of the facts and arguments related to veil-piercing will be analyzed under the substantive consolidation cause of action.

## C.    Substantive consolidation

This Court long ago recognized the principle of substantive consolidation.  *See Matter of Luth/In re Worley Grain Co.*, 28 B.R. 564, 566 (Bankr. D. Idaho 1983) (citing *In re Manzey Land & Cattle Co.*, 17 B.R. 332, 337 (Bankr. D. S.D. 1982).  The result of substantive consolidation is the merging or pooling of all

MEMORANDUM OF DECISION - 36

assets and liabilities and the elimination of inter-entity claims. *Id.*

*Wheeler* outlined the Ninth Circuit authority on substantive consolidation,

including the seminal case of *Alexander v. Compton (In re Bonham)*, 229 F.3d 750

(9th Cir. 2000).  444 B.R. at 608–09.  More recently, the Bankruptcy Appellate

Panel did as well:

> Substantive consolidation is an uncodified, equitable doctrine
> allowing the bankruptcy court, for purposes of the bankruptcy, to
> "combine the assets and liabilities of separate and distinct—but
> related—legal entities into a single pool and treat them as though they
> belong to a single entity." *In re Bonham*, 229 F.3d at 764.  The
> doctrine "enables a bankruptcy court to disregard separate corporate
> entities, to pierce their corporate veils in the usual metaphor, in order
> to reach the assets for the satisfaction of debts of a related corporation."
> *Id.*  The essential purpose behind the doctrine is one of fairness to all
> creditors, but it is a doctrine to be used sparingly.  *Id.* at 764, 768.
>
> In *Bonham*, the Ninth Circuit adopted a disjunctive two-factor
> test for determining whether application of the substantive
> consolidation doctrine is warranted.  In applying the test, courts
> consider whether creditors dealt with the entities as a single economic
> unit and did not rely on their separate identity in extending credit or
> whether the affairs of the debtor are so entangled that consolidation
> will benefit all creditors.  229 F.3d at 766.  "In either case, the
> bankruptcy court must in essence determine that the assets of all the
> consolidated parties are substantially the same."[56] *Bonham*, 229 F.3d
> at 771.  Ultimately, the decision to apply the substantive consolidation
> doctrine stems from a weighing of the equities and must be tailored to
> meet the needs of each particular case.  *Id.*
>
> Trustee, as the moving party, has the initial burden of showing
> either one of the *Bonham* factors are met.  *Reider v. Fed. Deposit Ins.
> Corp. (In re Reider)*, 31 F.3d 1102, 1107 (11th Cir. 1994).  Once
> trustee establishes a close interrelationship between debtors and the

---

[56]  Recall, both Debtor and Appleby asserted that "the Trust's assets are the LLC's
assets" and treated them as such, and Debtor treated them all as part and parcel of his personal
financial affairs.

MEMORANDUM OF DECISION - 37

non-debtor entities, there is a presumption that creditors did not rely on their separate credit.  The burden of proof then shifts to the parties opposing substantive consolidation to show otherwise.  *Bonham*, 229 F.3d at 767.

*Luxury Jewels, LLC v. Akers (In re Arronsakool)*, 2014 WL 1273696, at *8 (9th Cir. BAP Mar. 28, 2014).  The factors (creditors dealing with the entities as a single economic unit, or the affairs of the entities being so entangled that consolidation benefits all creditors) are considered in the disjunctive, and only one need be present to support substantive consolidation.  *Team Spirit America, LLC v. Kriegman (In re LLS America, LLC)*, 2012 WL 2042503 at *10 (9th Cir. BAP June 5, 2012).

Bonham considered "whether a bankruptcy court may order substantive consolidation of two non-debtor corporations . . . with the bankruptcy estate of [an individual] Chapter 7 debtor . . . *nunc pro tunc* as of the filing date of the . . . Chapter 7 petition."  229 F.3d at 758.  The Court of Appeals thoroughly and carefully considered the historical precursors of, and the equitable powers underlying, the bankruptcy court's ability to order substantive consolidation.  In addition to the aspects summarized by the BAP in *Aroonsakool*, the Ninth Circuit noted that "in ordering substantive consolidation, courts must (1) consider whether there is a disregard of corporate formalities and commingling of assets by various entities; and (2) balance the benefits that substantive consolidation would bring against the harms that it would cause."  *Bonham*, 229 F.3d at 765 (citing *Reider*, *supra*, 31 F.3d at 1106; other citations omitted).  "No uniform guideline for

MEMORANDUM OF DECISION - 38

determining when to order substantive consolidation has emerged. Rather, '[o]nly through a searching review of the record, on a case-by-case basis, can a court ensure that substantive consolidation effects its sole aim: fairness to all creditors.'" *Id.* (citations omitted).[57]

*Bonham* expressly adopted the Second Circuit test in *Union Sav. Bank. v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518–19 (2d Cir. 1988). *See* 229 F.3d at 766. *Augie/Restivo Baking* identified several relevant facts and circumstances supporting such consolidation, including: whether the interrelationships between the entities were closely entangled; whether the entanglement of business affairs was so extensive that the cost of untangling would outweigh any benefit to creditors; the presence or absence of consolidated financial statements; the difficulty in segregating the individual debtor's assets and liabilities; whether there was a unity of interests and ownership; and whether assets were transferred without observance of corporate formalities. *See* 860 F.2d at 518. These, and others, were distilled into the two overarching factors articulated by *Bonham*.

In *Bonham*, the record clearly showed the debtor commingled her assets

---

[57] Though not controlling, the approach of the Third Circuit on the subject is similar and its articulation instructive. It requires proof that (i) the separateness of the entities prepetition was disregarded so significantly that creditors relied on the breakdown of entity borders and treated them as one legal entity, and (ii) postpetition the assets and liabilities of the entities are so scrambled that separating them is prohibitive and hurts all creditors. *In re Owens Corning*, 419 F.3d 195, 211 (3rd Cir. 2005). *Owens Corning* described the "result" of the substantive consolidation "is that claims of creditors against separate debtors morph [in]to claims against the consolidated survivor." *Id.* at 206.

MEMORANDUM OF DECISION - 39

with those of the two closely-held corporations, there was "no clear demarcation between [their] affairs" and debtor "often commingled the assets and names" of the entities. Thus, the bankruptcy court "did not clearly err in determining that the exercise of disentangling the affairs . . . would be needlessly expensive and possibly futile." *Id.* at 767. *Bonham* also validated the propriety of ordering substantive consolidation *nunc pro tunc*. The bankruptcy court should enter such an order *nunc pro tunc* "only when it is satisfied that the use of *nunc pro tunc* yields benefits greater than the harm it inflicts" which, the court noted, "virtually parallels [the inquiry] used . . . in assessing whether to order substantive consolidation in the first place." *Id.* at 770.

Plaintiff has presented a thorough record of Debtor's financial and operational commingling of his personal affairs with the Trust and the LLC. Plaintiff established that creditors generally dealt with Debtor and the LLC as a single economic unit, an approach encouraged and abetted by Debtor's lack of clarity (whether intentional or negligent) in conducting his and the LLC's business. And neither creditors nor Debtor gave much, if any, regard to the Trust and the Trust's position as the sole member of the LLC. Only on rare occasions did creditors appear to be aware of and acknowledge the separateness of the LLC, the Trust, and Debtor, and the evidence did not suggest that those occasions were motivated by Debtor , the LLC or the Trust making the distinctions clear.

Debtor drew at his unfettered pleasure from the LLC. All such

MEMORANDUM OF DECISION - 40

distributions were characterized as "Jay's Income (owner draws)." There was no record-keeping or accounting to establish any distributions to the "member" of the LLC—*i.e.*, the Trust—nor was there any accounting of distributions by Debtor (as trustee of that Trust) to himself (as grantor/beneficiary) or to his children as beneficiaries outside of what might be gleaned from the LLC's "owner draws" entries.

The formation documents for the Trust are flawed, incomplete and inconsistent. There was no proof the Trust was initially funded, and the 2010 amendment, Ex. 101, conflates the LLC's assets with the Trust's funding. The Trust kept no documentary records beyond the Trust agreement and the modification to that agreement, Exs. 100 and 101. There were no bank accounts and no records of activities from 2008 to 2012.

In general, there was an exploitation of, and a disregard for the economic and legal separateness of, the LLC and the Trust. The Defendants' asserted propriety and regularity of Trust and LLC conduct is, at best, an after-the-fact gloss on contrary and preponderating evidence.

In addition to the first disjunctive test of *Bonham* being satisfied, the second disjunctive test is also met. Plaintiff presented a preponderating case that the financial affairs are so entangled that unraveling (or "unscrambling") them would require significant time, effort and expense, and without any realistic assurance that the result would be accurate or without potential injury. The

MEMORANDUM OF DECISION - 41

documentary record that Defendants rely upon to support separateness of the LLC and its member Trust is conflicting and inconclusive. And the testimony—particularly that of Debtor—does not support the weight that Defendants seek to give it.

Defendants' assertions that there is sufficient separateness to withstand substantive consolidation are unconvincing. They rely on documents that are ambiguous and inconsistent. And Debtor's testimony, designed to reinforce both intended and manifested separateness, lacks trustworthiness and credibility.

Even if the Court were to find some support for Defendants' arguments on these fronts, the manner of record-keeping and the conflation of individual, Trust and LLC activities, assets, and obligations has resulted in a situation that defies the ability to segregate the assets and liabilities in order to separately administer the same. As in *Bonham*, the "exercise of disentangling the affairs . . . would be needlessly expensive and possibly futile." The time, effort and expense involved in such an exercise would grossly outweigh the benefit to all creditors.

The case law is clear that the doctrine of substantive consolidation is flexible as well as equitable. In many ways, the doctrine was created to do equity when a debtor has acted inequitably. That there is inherent imprecision and, consequently, some potential prejudice to a creditor when assets and liabilities are consolidated is a given. In fact, the *Bonham* test requires an evaluation of whether the benefits of consolidation outweigh any such harm. And the second factor

MEMORANDUM OF DECISION - 42

emphasizes the entanglement of affairs, where the time and expense to unscramble them and properly allocate assets and liabilities is so substantial as to threaten the realization of net assets for all the creditors "or where no accurate identification and allocation of assets is possible."  229 F.3d at 766.

The Court has carefully and deliberately evaluated the evidence in light of the authorities, consistent with *Bonham*'s apothegm that only through a searching review of the record, case by case, can the Court ensure that substantive consolidation effects its sole aim of fairness to all creditors.  *Id.* at 765.  It finds that both of the *Bonham* factors have been established.  The Court concludes that substantive consolidation benefits creditors and far outweighs any potential harm. Judgment will be entered for Plaintiff on this cause of action, and the Trust and the LLC will be substantively consolidated with Debtor effective *nunc pro tunc* as of the March 27, 2012 filing.  The Trust's assets (*i.e.*, the member interest in the LLC) and the LLC's assets will therefore be administered by Plaintiff along with Debtor's individually held, non-exempt assets.  The liabilities will be treated in common with Debtor's liabilities.  All creditors will form a common pool to be paid, in accord with bankruptcy requirements, from a single pot.

### E.    Fees and costs

Plaintiff's final count of the Complaint seeks an award of attorneys' fees and costs.  Federal courts follow the "American Rule" which prohibits fee shifting absent a specific applicable statute or contractual provision, and there is no general

MEMORANDUM OF DECISION - 43

right in bankruptcy litigation to recover attorneys' fees.  *Bertola v. Northern Wisconsin Produce Co. (In re Bertola)*, 317 B.R. 95, 99 (9th Cir. BAP 2004) (citations omitted); *see also Kilborn v. Haun (In re Haun)*, 396 B.R. 522, 527 (Bankr. D. Idaho 2008).  Though state law was relevant in certain aspects, Plaintiff here prevails on the "uncodified, equitable doctrine allowing the bankruptcy court, for the purposes of the bankruptcy," to order substantive consolidation of a non-debtor's assets and liabilities with those of the Debtor's estate.  Plaintiff has identified no applicable statutory provision (state or federal) nor contractual provision applicable to fee recovery in this situation.  No relief will be granted to Plaintiff under this cause of action.[58]

## CONCLUSION

Plaintiff's cause of action for a judgment declaring the LLC and the Trust "invalid" *ab initio* due to their creation by Debtor as part of a scheme to hinder, delay and defraud creditors shall be dismissed.  The requested relief in the nature of veil-piercing is found not to constitute a substantive cause of action but, instead, to be a remedy.  Still, the evidence adduced under this pleaded cause was relevant to, and the relief sought thereby effectively identical to, Plaintiff's cause of action seeking substantive consolidation.  On the above findings of fact and conclusions of law, and for the reasons stated, the Court will enter judgment for Plaintiff on the

---

[58]   Two additional points are worth noting.  First, since there will be substantive consolidation, it is questionable whether Defendants will have any assets or ability with which to respond to an award of fees.  Second, Plaintiff's counsel's compensation falls under §§ 330 and 331, and payment, upon allowance, may be addressed in the chapter 7 case in due course.

MEMORANDUM OF DECISION - 44

cause of action seeking substantive consolidation.  Thus, the Court concludes the

cause of action seeking declaratory judgment on the issue of revocation of the

Trust has been rendered moot.  No attorneys' fees will be awarded.

   Plaintiff shall submit a proposed judgment consistent with this Decision.

DATED:  December 30, 2014

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 45